813 So.2d 46 (2002)
PANDA ENERGY INTERNATIONAL, Appellant/Cross-Appellee,
v.
E. Leon JACOBS, Jr., et al. as the Florida Public Service Commission, Appellees/Cross-Appellants.
No. SC01-284.
Supreme Court of Florida.
February 21, 2002.
*48 Suzanne Brownless, Tallahassee, FL, for Appellant/Cross-Appellee.
Harold McLean, General Counsel, and Richard C. Bellak, Associate General Counsel, Florida Public Service Commission, Tallahassee, FL; and Robert A. Glenn, Director, Regulatory Group Counsel, Florida Power Corporation, St. Petersburg, FL, and Gary L. Sasso, James Michael Walls, and Jill H. Bowman of Carlton Fields, St. Petersburg, FL, for Appellees/Cross-Appellants.
PER CURIAM.
We have on appeal a decision of the Florida Public Service Commission ("PSC") relating to its order granting a determination of need to Florida Power Corporation ("FPC") for the construction of a 530-megawatt electrical power plant. We have jurisdiction. See art. V, § 3(b)(2), Fla. Const. For the reasons that follow, we affirm the PSC's order.

BACKGROUND
Panda Energy International, Inc. ("Panda") challenges the PSC's order granting a determination of need for a 530-megawatt electrical power plant that FPC proposes to build in Polk County, Florida, referred to as the "Hines 2" power plant. Panda raises the following issues before this Court: (1) whether the PSC abused its discretion in limiting Panda's opportunity to conduct discovery and in denying Panda's motion for a continuance after the PSC granted Panda intervenor status; (2) whether the PSC applied an incorrect standard in determining the need for the Hines 2 power plant based on this Court's decision in Tampa Electric Co. v. Garcia, 767 So.2d 428 (Fla.2000); and (3) whether the PSC's finding that FPC's bidding process complied with Florida Administrative Code Rule 25-22.082 is supported by competent substantial evidence.
Before seeking regulatory approval to build Hines 2, FPC engaged in an analysis of its need, and determined that the Hines 2 power plant presented the most cost-effective option. After completing this internal review, FPC issued a request for proposals ("RFP"), inviting independent power producers and others to offer superior alternatives to Hines 2. Ultimately, thirteen bidders (not including FPC) gave notice of their intent to submit a bid. *49 However, when the time came to actually submit a bid, only two biddersincluding Pandasubmitted bids on the project.
FPC ultimately rejected Panda's proposal based on its determination that both bids submitted in the RFP process were inferior to FPC's proposed alternative that it could build itself (the "self-build" alternative).[1] Although Panda's proposal was the next most cost-effective proposal to FPC's self-build alternative, FPC concluded that Panda's proposal would have cost FPC's ratepayers over $60 million more than its Hines 2 plant, even accepting the most favorable assumptions regarding what generating resources FPC could hope to obtain when the Panda contract expired.
On August 7, 2000, FPC filed its petition for determination of need with the PSC, pursuant to section 403.519, Florida Statutes (2000), seeking approval to build Hines 2. The PSC rendered its final order granting FPC's determination of need on January 5, 2001. The PSC found "that Florida Power Corporation has a need for additional capacity to maintain the reliability and integrity of its system." The PSC also found the "Hines Unit 2 to be the most cost-effective alternative over the 25 years during which FPC's ratepayers will be obligated for the costs of the unit." The PSC recognized that "the entire Hines 2 plant will count toward FPC's reserve margin" and that the parties had stipulated that the unit "will be fully committed to helping FPC meet its obligation to provide reliable electric service to ratepayers at a reasonable cost." Moreover, the PSC found that FPC fully complied with the PSC's bid rule.

DISCUSSION

1. Limitation on Discovery and Denial of Continuance

In Panda's first claim on appeal, it asserts that the PSC denied it due process as an intervenor by limiting its opportunity to participate in discovery and by denying its request for a continuance in FPC's need determination proceeding. Limitations on discovery and denials of continuances are reviewed for an abuse of discretion. See MCR Funding v. CMG Funding Corp., 771 So.2d 32, 36 (Fla. 4th DCA 2000); Thompson v. Deane, 703 So.2d 1215, 1216 (Fla. 5th DCA 1997); Manasota-88, Inc. v. Agrico Chem. Co., 576 So.2d 781, 782-83 (Fla. 2d DCA 1991) (holding no abuse of discretion in denying intervenor a continuance).
On August 7, 2000, FPC filed its petition for determination of need for the Hines 2 power plant. The PSC appointed a prehearing officer who, in turn, issued a scheduling order on August 30, 2000.[2] *50 The order set the case for final hearing on October 26-27, 2000. The order further provided that any intervenors had until September 11, 2000, to file their prefiled testimony, the PSC staff had until September 18, 2000, to file their prefiled testimony, and FPC then had until September 25, 2000, to file any rebuttal testimony. The order required all parties to file prehearing statements by October 4, 2000, and the prehearing officer to conduct a prehearing conference on October 11, 2000. The order set October 19, 2000, as the cutoff date for all discovery.
Pursuant to this schedule, the PSC staff served interrogatories and document requests upon FPC and conducted depositions. The PSC staff filed prefiled testimony and FPC filed rebuttal testimony. FPC requested and obtained discovery of the PSC staff, including the deposition of an expert sponsored by the PSC staff. The deadline for filing testimony expired without anyone filing a motion to intervene. Moreover, both FPC and the PSC staff filed their prehearing statements without anyone seeking leave to intervene.
Although Panda attended the prehearing conference on October 11, 2000, it did so as a spectator because it had not filed a motion for leave to intervene. The following day, Panda sought leave to intervene in the need determination.[3] Panda filed the motion to intervene two weeks before the final hearing. Panda asserted that it delayed intervening in the need proceeding because it was waiting for this Court to decide the pending motions for reconsideration in Tampa Electric, which motions the Court denied in light of a revised opinion on September 28, 2000. Panda claimed that because the Tampa Electric decision potentially affected Panda's ability to sell power in Florida, it made the business decision to wait until the Court denied rehearing in Tampa Electric before intervening.
The PSC granted Panda leave to intervene and extended the discovery cutoff through noon of the day before the final hearing in order to permit Panda to take depositions that Panda's counsel stated she wanted. Moreover, FPC allowed Panda to take the deposition of FPC's consultant during the afternoon before the final hearing commenced and provided Panda discovery materials. The prehearing officer also ordered FPC to provide Panda with confidential documents before the hearing, and FPC complied with this order.
Under the facts in this case, we conclude that the PSC did not abuse its discretion in limiting Panda's opportunity to participate in discovery. Florida Administrative Code Rule 25-22.039, which provides for intervention in PSC proceedings, states, "Intervenors take the case as they find it."[4] As *51 noted above, Panda filed its motion to intervene on October 12, 2000, which was seven days before the discovery cutoff, and two weeks before the final hearing. Although Panda contends that it delayed intervening in the PSC proceeding until after the Court's decision of whether to grant rehearing in Tampa Electric, in fact, Panda waited two weeks until after this Court denied rehearing in Tampa Electric before filing the motion to intervene. Moreover, despite this late-filed motion to intervene, the prehearing officer extended the discovery cutoff date by one day, allowed Panda to take the depositions it requested, and required FPC to provide Panda with immediate access to all confidential information. Therefore, under these circumstances, we conclude that the PSC did not abuse its discretion in limiting Panda's opportunity to participate in discovery.
Panda also asserts that the PSC abused its discretion in denying Panda's request for a one-month continuance. We disagree. On October 25, 2000, one day after the PSC granted Panda intervention, Panda moved for a one-month continuance. The PSC denied Panda's motion, finding that Panda did not show "good cause" for granting the continuance pursuant to Florida Administrative Code Rule 28-106.210, which provides:
The presiding officer may grant a continuance of a hearing for good cause shown. Except in cases of emergency, requests for continuance must be made at least five days prior to the date noticed for the hearing.
(Emphasis supplied.)
We conclude that the PSC did not abuse its discretion in denying Panda's motion for a continuance. First, Panda filed its motion for a continuance two days before the hearing, thereby violating the five-day requirement of rule 28-106.210. Second, in order to obtain a continuance, Panda had to procure a waiver from the PSC's rule implementing the statutory deadlines for need proceedings. See § 120.542(2), (5), Fla. Stat. (2000); Fla. Admin. Code R. 28-104.002. Under section 120.542(2), the PSC shall grant a waiver when
the person subject to the rule demonstrates that the purpose of the underlying statute will be or has been achieved by other means by the person and when application of a rule would create a substantial hardship or would violate principles of fairness. For purposes of this section "substantial hardship" means a demonstrated economic, technological, legal, or other type of hardship to the person requesting the variance or waiver. For purposes of this section, "principles of fairness" are violated when a literal application of a rule affects a particular person in a manner significantly different from the way it affects other similarly situated persons who are subject to the rule.
Because the limited amount of time for preparing for this case was a direct result of Panda's decision to delay intervening, Panda has demonstrated neither a "substantial hardship" nor a violation of "principles of fairness." Therefore, we conclude that the PSC did not abuse its discretion in denying the request for a continuance.

2. Need Determination

In Panda's second claim, it asserts that the PSC applied an incorrect standard in conducting its needs analysis for the Hines 2 power plant. "Commission orders come to this Court `clothed with the statutory *52 presumption that they have been made within the [PSC's] jurisdiction and powers, and that they are reasonable and just and such as ought to have been made.'" Gulf Coast Elec. Coop., Inc. v. Johnson, 727 So.2d 259, 262 (Fla.1999).
Section 403.519, Florida Statutes (2000), sets forth the criteria the PSC must consider in conducting its needs analysis. Section 403.519 provides, in pertinent part:
In making its determination, the commission shall take into account the need for electric system reliability and integrity, the need for adequate electricity at a reasonable cost, and whether the proposed plant is the most cost-effective alternative available. The commission shall also expressly consider the conservation measures taken by or reasonably available to the applicant or its members which might mitigate the need for the proposed plant and other matters within its jurisdiction which it deems relevant.
In the PSC's final order, the PSC explained that the PSC and FPC stipulated that "the proposed Hines 2 Unit will be fully committed to helping FPC meet its obligation to provide reliable electric services to ratepayers at a reasonable rate."[5] Furthermore, the PSC's order stated:
We find that Florida Power Corporation has a need for additional capacity to maintain the reliability and integrity of its system, as contemplated by Section 403.519, Florida Statutes.
The record shows that FPC has demonstrated a need for additional capacity to meet its 20 percent minimum reserve margin criteria.[6] We conclude, however, that the decision to construct Hines 2 in the time frame sought is driven primarily by economics, including its equipment arrangements, and the use of the existing Hines Energy Complex as discussed below relating to cost-effectiveness. FPC is projected to grow into the capacity to be provided by Hines 2, particularly given the projected attrition in FPC's residential load management program.[7]
. . . .
We find that FPC has demonstrated that the cost of the electricity to be provided by Hines 2 is reasonable, based on cost-effectiveness.
FPC has demonstrated ... that Hines 2 will improve projected reserve margins such that FPC will exceed its minimum reserve margin criteria.... If Hines 2 is not brought into service, winter reserve margins for the years 2004-2010, will fall below the 20 percent minimum criterion. Thus, the addition of Hines 2 will contribute to the provision of adequate electricity to FPC's system.
The PSC's grant of a determination of need for a proposed power plant creates a presumption of public need. See *53 § 403.519, Fla. Stat. (2001). Panda concedes that in certifying the "need" for all 530 megawatts of Hines 2 capacity in 2003, the PSC has acted consistently with the applicable statutory criteria, its own rules, and a multitude of previous need determination decisions.[8] Panda contends, however, that this Court clarified this "need" standard set forth in section 403.519 in Tampa Electric by requiring the utility to demonstrate an actual present in-service need for all the electrical power to be generated at the proposed plant.[9]
We reject Panda's argument that our decision in Tampa Electric altered the requirements for the PSC in granting a certificate of need to a Florida regulated utility. Instead, Tampa Electric addressed whether the PSC had the statutory authority under the Siting Act to grant a determination of need to an entity other than a Florida retail utility regulated by the PSC whose petition was based upon a specified demonstrated need of Florida retail utilities for serving Florida power customers.
In Tampa Electric, a Florida municipal electric company filed a joint determination of need with an out-of-state wholesale generator who was not subject to regulation by the PSC as a public utility. 767 So.2d at 430. The PSC granted the companies' determination of need, and this Court reversed. See id. at 436. Based upon our interpretation of the statutes governing the PSC, we concluded that the Legislature had not intended to extend jurisdiction to the PSC to grant a determination of need to an applicant who was a non-regulated out-of-state wholesale power company where only thirty megawatts of the proposed 514-megawatt capacity had been committed by contract to be sold to a Florida utility. See id. at 436. Therefore, *54 contrary to Panda's assertion, the Court did not address, let alone change, the need determination standards pertinent to Florida retail utilities such as FPC. Consequently, we conclude that the PSC properly applied the criteria contained in section 403.519 in conducting its needs analysis in this case.[10] The PSC appropriately considered the economic benefit to the rate-payers, the integrity and reliability of the system in FPC's willingness to maintain a 20% reserve margin and to replace demand-site management with more firm assets, and that FPC was expected to grow into the capacity provided by Hines 2. All of the power generated will be available for the present and future needs of FPC's customers. Accordingly, competent substantial evidence supports the PSC's determination of need.

3. FPC's Bidding Process

Finally, Panda asserts that the PSC's finding that FPC's bidding process complied with Florida Administrative Code Rule 25-22.082 is not supported by competent substantial evidence. We disagree.
In its order, the PSC concluded that FPC's RFP complied with rule 25-22.082, which sets forth what must be included in a RFP.[11] The PSC found:

*55 FPC witness Crisp testified that on January 26, 2000, FPC issued an RFP to solicit proposals for alternatives to Hines 2. As contained in the Need Study, Exhibit 5, FPC met the requirements of Rule 25-22.082(3), Florida Administrative Code, by providing notice and disseminating the RFP to the electric industry at large. The RFP provided a detailed description of Hines 2, including the data and information required by Rule 25-22.082(4)(a), Florida Administrative Code. The RFP also included the schedule of critical dates for solicitation, evaluation, screening of proposals and any subsequent contract negotiations pursuant to Rule 25-22.082(4)(b), Florida Administrative Code.
FPC's RFP also listed the price and non-price attributes that would be evaluated, and offered that other non-price attributes not listed were encouraged. The RFP also included a description of FPC's evaluation methodology for each proposal.
Panda asserts that FPC's RFP was flawed in various ways. First, Panda contends that although the RFP listed price and non-price attributes to be considered in evaluating received bids, the RFP did not provide information regarding the weight to be given to either price or nonprice attributes. Second, Panda contends that the RFP was deficient because it did not specifically state what type of production costing models FPC would employ. Third, Panda maintains that FPC did not develop a short list after it conducted a screening, and instead unilaterally terminated discussions with both Panda and the other bidder on May 30, 2000. Panda asserts that had FPC developed a short list, FPC would have negotiated with the short list bidders, and this negotiation necessarily would have developed a final proposal different from that originally proposed. Finally, Panda claims that although FPC's rejection of Panda's bid was largely based upon the present worth revenue requirements ("PWRR") analyses it performed, Hagler Bailly, Inc., the firm hired to perform an independent review, made no attempt to replicate the PROVIEW PWRR model runs.[12] Panda notes that the Hagler Bailly consultant did not testify to the correctness of any of the data associated with the Hines 2 Unit in the RFP, the data which provided the input into the PROVIEW PWRR model runs. Therefore, Panda argues that to the extent that the data actually entered by FPC in the computer models is incorrect, the results may be erroneous.
As FPC explains, in every RFP there will be a trade-off between too much information and not enough information, and that if too much detail is included in an RFP, it may become too onerous or off-putting to potential bidders. Moreover, FPC claims that it patterned its RFP on the only available template actually approved by the PSC under its new bid rulean RFP developed by Gulf Power for its recent power plant proposal.
With regard to the failure to assign specific weights to various factors, the undisputed testimony at the final hearing indicated that FPC did not assign weights to various factors in advance because FPC wanted to stimulate, rather than limit, creativity in the proposals in order to "bring more value to [the] ratepayers." *56 The unchallenged testimony also explained that in order to allow bidders to give the utility their "best shot" in their proposals, the utility had to retain discretion to exercise subjective judgment about all aspects of the proposals, once the utility had the benefit of evaluating the entire packages.
Concerning the failure to specify the production costing model FPC would employ, the PSC found:
Panda also contends in its brief that the RFP did not specifically state the models that would be used to evaluate proposals submitted. While Panda is correct, the universe of models used in the industry to evaluate production cost is small. We believe that omitting explicit reference to models in the RFP is not violative of the bid rule.
Furthermore, the undisputed evidence at the final hearing was that the models FPC used were industry standards.
Panda's assertion that FPC should have created a "short list" and then proceeded to enter into detailed contract negotiations with bidders on that list is without merit. The undisputed evidence shows that FPC received only two bids, and that it afforded both bidders full and fair consideration. Moreover, the undisputed evidence demonstrates that FPC did engage in some negotiations with both bidders, and that the pricing of Panda's proposal increased during the course of these discussions.
Finally, we reject Panda's argument that there was no objective review of FPC's PWRR modeling results. First, Panda cites to no authority for the proposition that an objective review of FPC's modeling results must be conducted, and we have found no authority to support this assertion. Second, the consultant from Hagler Bailly did conduct an independent modeling and analysis, and testified at the final hearing that FPC's work was fair, reasonable, and appropriate. Therefore, we hold that the PSC's conclusion that the RFP was proper is supported by competent substantial evidence.
In conclusion, we approve the PSC's order granting a determination of need to FPC to build a 530-megawatt electrical power plant.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.
NOTES
[1] As found by the PSC: "Panda's initial offering was for 250 MW [ ("megawatts") ] for two years, with options to extend for one year periods for up to three additional years. Panda supplemented its initial offering with an additional 250 MW block of power following meetings with FPC. This was done at FPC's request to match FPC's needed capacity. Panda's second 250 MW block of power was more costly than the initial 250 MW offering."
[2] Sections 403.501-.518, Florida Statutes (2000), entitled the Florida Electrical Power Plant Siting Act ("Siting Act"), together with the implementing rules adopted by the PSC, prescribe time limits by which the PSC must conduct a hearing on a petition for a determination of need and provide its final decision and recommendation to the Department of Environmental Protection ("DEP"). See § 403.507(2)(a)2, Fla. Stat. (2000); Fla. Admin. Code R. 25-22.080. Specifically, the PSC implementing rules require that the PSC conduct a hearing within 90 days from the date the need petition is filed. See Fla. Admin. Code R. 25-22.080(2). The PSC must make a decision on the need petition within 135 days of the date the petition is filed to provide its final recommendation to DEP. See § 403.507(2)(a)2, Fla. Stat. (2000); Fla. Admin. Code R. 25-22.080(2).
[3] FPC opposed Panda's motion to intervene, claiming that it lacked standing as an intervenor because Panda's plan "could not legally be sited as an alternative to Hines 2" pursuant to this Court's decision in Tampa Electric. Both the PSC prehearing officer and the full PSC on reconsideration rejected FPC's argument because it found that Panda "need not show that it would prevail in order to intervene."
[4] In this respect, rule 25-22.039 is similar to Florida Rule of Civil Procedure 1.230, which provides: "Anyone claiming an interest in pending litigation may at any time be permitted to assert a right by intervention, but the intervention shall be in subordination to, and in recognition of, the propriety of the main proceeding, unless otherwise ordered by the court in its discretion." Fla. R. Civ. P. 1.230. See Coast Cities Coaches, Inc. v. Dade County, 178 So.2d 703, 706 (Fla.1965) ("It is settled law, however, that an intervening defendant is bound by the record made at the time that he intervenes and must take the suit as he finds it unless the court, in its discretion, otherwise orders.").
[5] The PSC and FPC entered into this stipulation between October 11, 2000the date of the prehearing conferenceand October 24, 2000the date of the prehearing order. This occurred before the PSC granted Panda intervention.
[6] The reserve margin is the ratio of total "firm" generating capacity that a power utility can rely on in times of need in relation to the utility's "firm" load, comprising those customers who have not agreed to accept occasional interruptions in service in exchange for reduced rates. Fla. Admin. Code R. 25-6.035(1). On December 22, 1999, the three largest investor-owned utilities in Florida FPC, Florida Power & Light, and Tampa Electric Companyagreed to increase their reserve margin planning criteria on a voluntary basis to a minimum of 20 percent, commencing no later than summer 2004.
[7] The residential load management program is a program in which FPC made agreements with customers to accept interruption in service and other conservation efforts instead of adding actual generating capacity to its system.
[8] See, e.g., Fla. Admin. Code R. 25-22.081(3) ("If a determination is sought on some basis in addition to or in lieu of capacity needs ... then detailed analysis and supporting documentation of the costs and benefits is required."); In re Petition for Determination of Need for the Osprey Energy Center in Polk County by Seminole Electric Cooperative and Calpine Construction Finance Company, L.P., 01 F.P.S.C. 2:443, 446 (2001) (PSC certified a 529-megawatt combined cycle exempt wholesale generation plant in 2003 when only 350 megawatts was contractually committed to provide 88 megawatts of the retail needs of Seminole Electric Cooperative in 2004); In re Petition to Determine Need for Proposed Electrical Power Plant in St. Marks, Wakulla County, by City of Tallahassee, No. 961512EM, 1997 WL 374434 (June 9, 1997) (order no. PSC-97-0659-FOF-EM) (explaining that the PSC has previously recognized that "it is not unusual for a utility to grow into the capacity of a large generating unit"); In re Petition to Determine Need for Proposed Capital Expansion Project of the Dade County Resources Recovery Facility, an Existing Solid Waste Facility, by Metropolitan Dade County, 93 F.P.S.C. 11:375, 381 (1993) ("Although the expanded facility will not contribute to the reliability and integrity of the state's electric system, the energy is cost-effective and will displace fossil fuels."); In re JEA/FPL's Application of Need for St. John's River Power Park Units 1 and 2 and Related Facilities, 81 F.P.S.C. 6:220, 221-22 (1981) ("We construe the `need for power' issue to encompass several aspects of need ... the electrical need for additional capacity ... the economic need of providing this bulk power and energy at the lowest possible cost ... the socioeconomic need of reducing the consumption of imported oil in the State...."); In re Petition for Certification of Need for Orlando Utilities Commission, Curtis H. Stanton Energy Center Unit 1, and Related Facilities, 81 F.P.S.C. 10:18 (1981) (PSC approved 415-megawatt coal plant that was not needed for reliability purposes by any utility involved in the application until 1991, which was five years after the in-service date of the plant).
[9] Panda relies on the following statement from Tampa Electric: "A determination of need is presently available only to an applicant that has demonstrated that a utility or utilities serving retail customers has specific committed need for all of the electrical power to be generated at a proposed plant." 767 So.2d at 434.
[10] We likewise decline the PSC's invitation to revisit and recede from Tampa Electric. We based our decision in Tampa Electric on our reading of the statute regarding legislative intent as to the scope of the PSC's authority over out-of-state power wholesalers. Thus, the solution for the PSC or other interested entities if they desire to expand the PSC's authority is to seek an amendment to the statute. As we clearly stated:

[W]e find that the Legislature must enact express statutory criteria if it intends such authority for the PSC. Pursuant only to such legislative action will the PSC be authorized to consider the advent of the competitive market in wholesale power promoted by recent federal initiatives. Such statutory criteria are necessary if the Florida regulatory procedures are intended to cover this evolution in the electric power industry.
Id. at 435.
[11] Rule 25-22.082(4) provides:

(4) Each utility's RFP shall include, at a minimum:
(a) A detailed technical description of the utility's next planned generating unit or units on which the RFP is based, as well as the financial assumptions and parameters associated with it, including, at a minimum, the following information:
1. a description of the utility's next planned generating unit(s) and its proposed location(s);
2. the MW size;
3. the estimated in-service date;
4. the primary and secondary fuel type;
5. an estimate of the total direct cost;
6. an estimate of the annual revenue requirements;
7. an estimate of the annual economic value of deferring construction;
8. an estimate of the fixed and variable operation and maintenance expense;
9. an estimate of the fuel cost;
10. an estimate of the planned and forced outage rates, heat rate, minimum load and ramp rates, and other technical details;
11. a description and estimate of the costs required for associated facilities such as gas laterals and transmission interconnection;
12. a discussion of the actions necessary to comply with environmental requirements; and
13. a summary of all major assumptions used in developing the above estimates;
(b) a schedule of critical dates for solicitation, evaluation, screening of proposals and subsequent contract negotiations;
(c) a description of the price and non-price attributes to be addressed by each alternative generating proposal including, but not limited to:
1. technical and financial viability;
2. dispatchability;
3. deliverability (interconnection and transmission);
4. fuel supply;
5. water supply;
6. environmental compliance;
7. performance criteria;
8. pricing structure; and
(d) a detailed description of the methodology to be used to evaluate alternative generating proposals on the basis of price and non-price attributes.
[12] PROVIEW is a PWRR computer program.