ROTHENBERG, C.J.
*1165 INTRODUCTION
Fabian Pickett ("the defendant") appeals from a final judgment of conviction and sentence for attempted second-degree murder with a deadly weapon, witness tampering, and criminal mischief. Specifically, the defendant contends that: (1) he is entitled to a new trial as to the attempted murder charge because the trial court erred by admitting evidence of a collateral armed robbery earlier that day as inextricably intertwined evidence, and the State relied on evidence at trial that was later determined to be false to bolster the credibility of a key witness; and (2) he was entitled to a judgment of acquittal as to criminal mischief because the State failed to prove the charge.
BACKGROUND
The defendant was charged with the attempted second-degree murder with a deadly weapon of his ex-girlfriend, Andrea Smith ("Andrea"), and Andrea's cousin, Robert Smith ("Robert"), witness tampering, and criminal mischief. A summary of the evidence is as follows.
On March 23, 2015, Andrea was living with her cousin Robert and her grandmother, Diane Smith ("Ms. Smith"). When Ms. Smith and Robert returned home that day, Ms. Smith saw the defendant in her yard. Ms. Smith exited the car, reminded the defendant that she had previously told him that he was not allowed on her property, and demanded that the defendant leave. The defendant told Ms. Smith that he just wanted to return Andrea's cell phone. As Ms. Smith was telling the defendant that he would have to return the cell phone to Andrea somewhere else, Andrea exited the house, warned her grandmother that the defendant had a gun, and told her grandmother that the defendant had taken her cell phone while threatening her earlier that day.
The situation rapidly deteriorated. The defendant became angry, loud, and agitated, and Robert exited the car and demanded that the defendant leave. The defendant responded by asking Robert, "who the f*ck are you?" and Robert responded in kind by cursing and calling the defendant names. As the defendant began backing up down the street, he threatened to kill Andrea and her family while Robert continued to curse at the defendant and demand that he leave. When the defendant was three or four houses away, the defendant pulled out a gun and started shooting towards Andrea and Robert. Andrea and Robert ducked and ran back towards their house. At trial, a neighbor testified that he saw the defendant firing a gun five to six times as he was moving backwards; however, he could not see who the defendant was shooting at. That same neighbor later found a bullet in his coconut tree and a couple of bullets in his fence.
The police processed the scene and recovered bullet casings and a cell phone. The police photographed and processed the phone, which was later determined to contain the defendant's DNA. The police, however, never asked Andrea if the cell phone they found at the scene was the phone that the defendant had allegedly taken from her and never examined the phone's content to determine if it was, in *1166 fact, Andrea's phone. At trial, when Andrea was shown a photograph of the cell phone that was recovered at the scene, she identified it as her cell phone.
Over defense objection, the State introduced collateral crimes evidence that when Andrea returned home, approximately five hours prior to the charged crimes, she found the defendant there waiting for her. When she arrived, the defendant opened the driver's side door of Andrea's car, pointed a gun to her head, demanded her cell phone, demanded to know where she had been, and threatened to kill her. Andrea dropped her phone. The defendant picked up the cell phone and began searching the phone to see who Andrea had been in contact with. While the defendant was scrolling through Andrea's phone, Andrea put her car in reverse and backed out of the driveway. The defendant stood in front of Andrea's car and pointed a gun at her as she backed away. Andrea drove to a friend's house and called the police. She returned home later that morning, and while in her bedroom, she heard a knock on her window and became scared. When she looked out of her window, she saw the defendant holding up what she believed was her phone and motioning for her to come outside to retrieve her phone. Andrea did not go outside because she was afraid the defendant was still armed with a firearm.
The jury found the defendant guilty of the attempted second-degree murder of Robert, witness tampering, and criminal mischief, and acquitted the defendant as to the attempted murder of Andrea. The trial court sentenced the defendant to a twenty-year minimum mandatory prison term for the attempted murder and witness tampering charges, with a fifteen-year minimum mandatory habitual offender enhancement and a twenty-year minimum mandatory firearm enhancement. The defendant was also sentenced to sixty days in jail on the criminal mischief count.
After the trial, when it was discovered that the cell phone found at the scene belonged to the defendant, not to Andrea, the defendant moved for a new trial claiming that his due process rights were violated. The motion was denied, and this appeal followed.
ANALYSIS
I. Admission of Collateral Crimes Evidence
The defendant contends that the trial court erred by allowing the State to introduce evidence of the defendant's armed robbery of Andrea that occurred five hours prior to the shooting. Specifically, the defendant argues that the collateral crimes evidence was neither necessary, nor relevant, for the jury to understand the sequence of events. The State, on the other hand, claims that the collateral crimes evidence was properly admitted as relevant and inextricably intertwined evidence of events that transpired just a few hours before the incident in question.
Collateral crimes evidence is admissible under section 90.402 of the Florida Statutes if it is a "relevant and inseparable part of the act which is in issue." D.M. v. State, 714 So.2d 1117, 1119 (Fla. 3d DCA 1998) (quoting Charles W. Ehrhardt, Florida Evidence § 404.17 (1993 ed.) ). Evidence is inextricably intertwined when the evidence is necessary to: (1) adequately describe the deed; (2) provide an intelligent account of the crime(s) charged; (3) establish the entire context out of which the charged crime(s) arose; or (4) adequately describe the events leading up to the charged crime(s). Dorsett v. State, 944 So.2d 1207, 1213 (Fla. 3d DCA 2006). The trial court's ruling on the admissibility of collateral crimes evidence is reviewed *1167 for an abuse of discretion. See Beckman v. State, 230 So.3d 77, 84 (Fla. 3d DCA 2017) (citing Knight v. State, 15 So.3d 936, 938 (Fla. 3d DCA 2009) ).
We have reviewed the record on appeal and find no abuse of discretion. The evidence of the earlier confrontation between Andrea and the defendant, just a few hours prior to the charged offenses, was relevant and necessary because it helped explain the entire context out of which the charged offenses arose and provided an intelligent account of the events leading to the charged offenses. The evidence explained why the defendant was at the house, the broken relationship between the defendant and Andrea, the defendant's obsessive behavior towards Andrea, why he over-reacted when he saw Robert (another male who he did not know) at Andrea's house, and why Andrea felt intimidated when the defendant repeatedly called her from jail to ask her to drop the charges. The evidence of the defendant's armed robbery of Andrea was, therefore, properly admitted as inextricably intertwined evidence.
II. The False Identification of the Cell Phone Found at the Scene
The defendant contends that he is entitled to a new trial based on the State's reliance at trial that the cell phone found at the scene was Andrea's phone, where it was later determined that the cell phone found at the scene was the defendant's cell phone, not Andrea's cell phone. The defendant claims that this evidence was material because it was used to bolster the credibility of Andrea-a key witness. The State claims that the defendant failed to properly preserve this issue because the challenge raised below was as to the sufficiency of the evidence, and even if properly preserved, the defendant is not entitled to a new trial.
The introduction of false evidence at trial is examined under the test articulated by the United States Supreme Court in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Generally, a court's decision with respect to a Giglio claim is a mixed question of law and fact, and a reviewing court will defer to the lower court's factual findings if they are supported by substantial competent evidence. Tennyson v. State, 43 Fla. L. Weekly D775, D776, 254 So.3d 510, ----, 2018 WL 1734490 (Fla. 3d DCA Apr. 11, 2018) (citing Suggs v. State, 923 So.2d 419, 426 (Fla. 2005) ). The trial court's application of the law to the facts is reviewed de novo . Sochor v. State, 883 So.2d 766, 785 (Fla. 2004). Unpreserved claims of false testimony, however, are reviewed for fundamental error. Tennyson, 254 So.3d at 518. Fundamental error is that which "reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Caraballo v. State, 39 So.3d 1234, 1249 (Fla. 2010) (quoting Brooks v. State, 762 So.2d 879, 899 (Fla. 2000) ).
A Giglio violation is established by showing that: (1) the testimony provided was false, (2) the prosecutor knew the testimony was false; and (3) the false statement was material. Guzman v. State, 941 So.2d 1045, 1050 (Fla. 2006). In other words, a Giglio claim is based on the prosecutor's knowing presentation of false testimony against the defendant. Giglio, 405 U.S. at 154-55, 92 S.Ct. 763. If the first two prongs of Giglio are established, the State bears the burden of demonstrating that the false evidence was immaterial by demonstrating beyond a reasonable doubt that the false testimony did not affect the verdict. Guzman, 941 So.2d at 1050-51. In other words, in assessing the materiality *1168 prong, the court must determine whether there is any reasonable possibility that the error contributed to the conviction. Id.
The Giglio standard was not met in this case. First, nothing in the record suggests that either Andrea, or the State, knowingly presented false testimony. Andrea was only shown a picture of the cell phone found at the scene which, based upon the picture she was shown, she believed to be the cell phone the defendant had taken from her earlier that day. Andrea's belief that the phone depicted in the photograph was her cell phone was reasonable as the defendant had taken her cell phone from her earlier that day; he appeared at her bedroom window and held up a cell phone which she was led to believe was her cell phone, and the defendant motioned for her to come outside to retrieve it; and the defendant told Andrea's grandmother that he was at the house to return Andrea's cell phone to her.
Andrea's mistaken identification was not material. Whether the dropped cell phone found at the scene was the defendant's or Andrea's neither proves nor disproves the earlier robbery of Andrea's phone. The fact that Andrea believed that the phone the defendant showed her at her bedroom window was hers was relevant as to Andrea's belief that the defendant was using the phone, which looked like her phone, to lure her into going outside. At trial, Andrea testified as follows:
Q: Okay. So, Andrea what happens when you're in your bedroom?
A: I hear a knock on the window.
Q: Did that knock scare you?
A: Yes, it did.
Q: And who is at the window when you look[ed] at the window?
A: Mr. Pickett.
Q: And what was he holding up to you at that point?
A: My cell phone.
....
Q: What is Mr. Pickett doing with your cell phone?
A: He is basically holding it to the window like come outside and get your phone.
Q: Okay. And is he telling you come outside if you want your phone? How is he telling you -
A: Like I'm gonna give you your phone, babe, come outside so you can get your phone.
Thus, the ownership of the cell phone found at the scene was only minimally relevant. The defendant does not dispute that he was at the house, he dropped a cell phone at the scene, and he fired a firearm six times in Robert's direction. Thus, the ownership of the cell phone found at the scene had little, if any, relevance as to whether the defendant had a reasonable belief that his use of deadly force against Robert was necessary.
We also note that the defendant testified that the phone recovered at the scene was his cell phone, and the detective who impounded the phone at the scene testified that: he never turned the phone on; he did not show the phone to Andrea; he never ran a forensic analysis on the phone to determine the phone number attached to the phone; the defendant's DNA was found on the phone; and he believed the phone was the defendant's cell phone.
Although, the defendant was unable to prove that the cell phone was his at trial because there was no battery in the phone and the phone could not be turned on, the evidence at trial certainly casted doubt that the phone that was dropped at the scene was the cell phone the defendant had taken from Andrea earlier that day. But, as already noted, whether the phone dropped was the phone taken from Andrea was immaterial as to whether the defendant was justified in using deadly force.
*1169 Thus, although the earlier armed confrontation between the defendant and Andrea, where the defendant took Andrea's phone in order to see who she was communicating with, was highly relevant to explain why he had returned and acted so violently when he saw a man he did not know show up at Andrea's house, the ownership of the cell phone dropped by the defendant during his confrontation with Robert was only minimally relevant, as the defendant could easily have been in possession of both phones at the time, and merely dropped his own cell phone. Because the defendant failed to establish a knowing presentation of false evidence or materiality, we conclude that no Giglio violation was proven and no fundamental error occurred. The trial court, therefore, did not abuse its discretion by denying the defendant's motion for a new trial.
III. Witness Tampering
The defendant contends that the State failed to prove witness tampering, and thus he is entitled to a judgment of acquittal as to that offense. Although the evidence establishes that the defendant attempted to obtain Andrea's sympathy in order to convince her to sign a non-prosecution affidavit, he claims that these attempts do not constitute witness tampering because there is no evidence of threats or intimidation and Andrea's subjective perception that she felt intimidated is not enough to support a conviction of witness tampering.
Because the defendant raised this issue in a motion for judgment of acquittal, we review the trial court's order denying the motion de novo to determine whether the evidence, viewed in the light most favorable to the State, is legally sufficient to support the jury's verdict. Izquierdo v. State, 177 So.3d 1018, 1020 (Fla. 3d DCA 2015) (citing Irizarry v. State, 905 So.2d 160, 165 (Fla. 3d DCA 2005) ). If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain the conviction. Pagan v. State, 830 So.2d 792, 803 (Fla. 2002) (citing Banks v. State, 732 So.2d 1065 (Fla. 1999) ). Upon review, we conclude that the record evidence is legally sufficient to support the jury's verdict and the defendant's conviction.
The defendant was charged with witness tampering in violation of section 914.22(1) of the Florida Statutes. Section 914.22(1)(a), Florida Statutes (2015), prohibits the use of intimidation, physical force, or threats with "the" intent to cause or induce any person to ... [w]ithhold testimony ... from an official investigation or official proceeding." The State may establish that a person intends to cause, or induce another to withhold testimony, by circumstantial evidence. State v. Atkinson, 490 So.2d 1363, 1365 (Fla. 5th DCA 1986). Whether a statement or other communication constitutes a true threat that has the probable consequence of causing reasonable apprehension in the hearer is a question of fact for the jury . Gill v. State, 622 So.2d 92, 93-94 (Fla. 2d DCA 1993) (citing United States v. Wilson, 565 F.Supp. 1416 (S.D. N.Y. 1983) ) (emphasis added).
In support of his position, the defendant cites to Banegas-Membran v. State, 182 So.3d 865 (Fla. 4th DCA 2016), where the defendant was charged with four counts of sexual crimes against a minor. Id. at 867. While in custody awaiting trial, the defendant sent a letter to his ex-girlfriend, the mother of the alleged victim. Id. at 867. In the letter, the defendant stated: "[S]top, don't do nothing else, just [don't] talk to anybody.... [Y]our silence is all I ask you." Id. The defendant tried to manipulate the victim's mother by telling her that if the case went to trial, "everybody [would] find out," and she would be "in the *1170 eye of a hurricane" fighting for custody of her children. Id. He concluded the letter by stating that such a scenario would "break [his] heart" because, in his opinion, the children belonged with her. Id. In that case, the defendant's communication was limited to that one letter. On that record, the Fourth District Court of Appeal reversed the conviction for witness tampering finding that that "tugging at the heartstrings" of the witness did not constitute intimidation because intimidation necessarily includes an element of fear. Id. at 869.
Banegas-Membran is easily distinguishable from the instant case. First, the defendant's one letter to the alleged victim's mother in Banegas-Membran pales in comparison to the defendant's repeated phone calls to Andrea-both prior to his arrest and after his apprehension. The facts of this case are more parallel to those in Pollen v. State, 834 So.2d 380 (Fla. 3d DCA 2003). In Pollen, the defendant was arrested for shoplifting. As he was taken into custody, he told the store's security guard, "I am going to come back and see you." Id. at 382. A few days later, as promised, the defendant returned to the store. Id. The security guard felt threatened and considered not testifying. Id. Because the defendant had no legitimate reason to return to see the security guard, this Court concluded that his statement, coupled with his actual return to the store, could reasonably be interpreted as a threat and a concerted effort by the defendant to dissuade the witness from testifying. Id. at 383-84.
Here, it was not unreasonable for Andrea to feel intimidated and be apprehensive. The defendant called Andrea repeatedly, even using subterfuge to get her to answer her phone, in his attempt to convince her to come to court and drop the charges. Prior to the defendant's arrest, the defendant called Andrea and asked her to meet him. Although Andrea agreed to meet him, she was so concerned that she contacted the police and advised them about the phone call, after which the defendant was apprehended and arrested. After his arrest, the defendant continued calling Andrea from jail. Andrea testified that she accepted one jail-house phone call from the defendant, and then asked him to leave her alone. Instead of "leaving her alone," the defendant began calling Andrea via three-way calling, so as to conceal where the phone calls were originating from. Andrea testified that when she realized it was the defendant calling her, she would hang up. Undeterred, the defendant would then have other individuals call Andrea using different phone numbers.
During the trial, the State presented an audio recording of one of the jail-house phone calls between the defendant and Andrea. The following are excerpts of statements made by the defendant during the phone call.
Baby can you do that for [me] can you come to court for me Monday?
....
Listen baby, listen man, I can't do that much time man. You feel me like, I'm telling you I'll straighten you out or whatever, whatever... [you] want my ol' girl....
....
Bae listen, can you come to court for me Monday? Please man, and once they, once they drop the charge ....
Bae listen, it's [sic] them detectives is not gonna be in court Monday. [None] of them is gonna be in court Monday, all you gotta do is bring your I.D. [Just] listen man I gotta get outta town. I gotta get up there with my mom ... like come on man, we [got] a bond hearing, how the fuck they gone [sic] give me a counter offer at [a] bond hearing like ... Come on man, I can't do no sixty *1171 years man. My mom old, you feel me like, bae this shit just tearing me apart ....
....
Hey[,] but listen baby, can you please come through Monday for me man and bring your I.D. and let them know you is not trying to pursue my charges or whatever, they gone drop that shit and umma get my bond and I'll be able to bond out and go back to my mom[,] please ....
....
Huh, yeah man, listen call [her] or whatever. She['s] [going to] send you whatever, holler at her man....
At trial, Andrea testified that she felt that the defendant was trying to bribe her by telling her that his "ol' girl," i.e., his mother, would pay her or give her whatever she wanted. She testified that she felt intimidated and scared going forward with the case because the defendant called her so many times. When viewed in isolation, the defendant's unwanted phone calls using sweet words could be viewed as an attempt to obtain sympathy by tugging at Andrea's heartstrings. However, these calls when viewed in context and in connection with the collateral crimes evidence of the defendant holding a gun to Andrea's head and threatening to kill her and his subsequent shooting at Andrea's family member, supports Andrea's fear of the defendant and the jury's verdict that the defendant's phone calls to Andrea constitute witness tampering under section 914.22(1)(a).
IV. Criminal Mischief
Lastly, the defendant contends that his conviction for criminal mischief cannot stand as the State failed to establish that he intended to shoot at the neighbor's property. Although we agree with the State that the defendant failed to properly raise this issue below and therefore, this issue may only be reviewed for fundamental error, we conclude that fundamental error was established here. In defining the scope of the fundamental error doctrine, the Florida Supreme Court has explained that a fundamental error is one that "goes to the foundation of the case or goes to the merits of the cause of action." Jaimes v. State, 51 So.3d 445, 448 (Fla. 2010) (quoting Sanford v. Rubin, 237 So.2d 134, 137 (Fla. 1970) ). Although the general rule requiring a contemporaneous objection applies to error based on the insufficiency of the evidence, there are limited categories of errors that are fundamental: (1) errors committed in death penalty cases and; (2) instances where the evidence is totally insufficient as a matter of law to establish the commission of a crime. F.B. v. State, 852 So.2d 226, 229-30 (Fla. 2003). The latter category applies here.
Pursuant to section 806.13(1)(a) of the Florida Statutes, a person commits the offense of criminal mischief if "he or she willfully and maliciously injures or damages by any means real or personal property belonging to another ...." Upon consideration of section 806.13, this Court has repeatedly recognized that when a defendant acts with malice toward another person, rather than toward property, that malice does not transfer to the property. See M.H. v. State, 936 So.2d 1, 5 (Fla. 3d DCA 2006) ; see also Walker v. State, 154 So.3d 448, 450 (Fla. 3d DCA 2014). Our sister courts have reached the same conclusion. See Sanchez v. State, 909 So.2d 981, 985 (Fla. 5th DCA 2005) (finding that the failure to show proof that a defendant specifically intended to damage or destroy the property in question is fatal to a conviction for criminal mischief); see also Stinnett v. State, 935 So.2d 632, 634 (Fla 2d DCA 2006) (finding that the intent to damage the property of another does not arise by operation of law where the defendant's *1172 true intention was to cause harm to the person of another).
Viewing the evidence in the light most favorable to the State, nothing in the record suggests that the defendant acted with malice toward the neighbor's property. Rather, the State alleged, and the jury found, that the defendant shot at, and attempted to kill Robert-thus, negating any argument that the shots fired by the defendant were directed at the neighbor's property. Accordingly, we find that the trial court erred by denying the defendant's motion for judgment of acquittal on the criminal mischief charge and, therefore, we reverse as to this count.
CONCLUSION
Consistent with the above, we find that: (1) the trial court did not abuse its discretion by admitting the collateral crimes evidence; (2) Andrea's testimony identifying the cell phone recovered at the scene as hers did not violate the defendant's due process rights; (3) the State presented competent and substantial evidence that the defendant committed witness tampering; and (4) the State failed to prove that criminal mischief was committed.
Affirmed in part; reversed in part.