800 So.2d 174 (2001)
Barry HOFFMAN, Appellant,
v.
STATE of Florida, Appellee.
No. SC94072.
Supreme Court of Florida.
July 5, 2001.
Rehearing Denied November 8, 2001.
*175 Gregory C. Smith, Capital Collateral Counsel, Linda McDermott, Assistant CCC-NR, and John A. Tomasino, Assistant CCC-NR, Office of the Capital Collateral Counsel-Northern Region, Tallahassee, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Barbara J. Yates, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
Barry Hoffman, a prisoner under sentence of death, appeals the trial court's denial, after an evidentiary hearing, of *176 postconviction relief. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Because the State failed to disclose evidence that was favorable to the defense, we reverse the order denying Hoffman's motion for postconviction relief and remand with directions that the conviction be vacated and a new trial granted. See Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

FACTUAL AND PROCEDURAL HISTORY
On September 7, 1980, Frank Ihlenfeld and Linda Parrish were murdered in a Jacksonville Beach motel room. Barry Hoffman (Hoffman) was arrested in Michigan for the murders in October 1981. Testimony developed at trial revealed that Hoffman had murdered the victims for Lenny Mazzara (Mazzara), a high-level drug dealer in Jacksonville who worked for James Provost (Provost), a local gangster. Hoffman and his codefendant, James White (White), 20, were procured to commit this murder by George "Rocco" Marshall (Marshall), one of Mazzara's employees. Marshall's wife owed Provost a $10,000 drug debt which would be partially or wholly forgiven if Marshall found someone to kill Ihlenfeld. Apparently, Ihlenfeld was also involved in the drug trade with Mazzara and Provost, but had stolen from Provost and owed him money. At Marshall's request, Hoffman agreed to commit the murders in exchange for $5,000. White assisted in the murders in exchange for $500.
Evidence presented at trial implicating Hoffman in the crimes included a package of cigarettes found in the hotel room with Hoffman's fingerprint and confessions by Hoffman to FBI agents and Jacksonville Beach Police officers. Hoffman was indicted by a grand jury for two counts of first-degree murder on October 28, 1981. On March 25, 1982, Hoffman was charged by information with conspiracy to commit murder in the first degree. The two cases were consolidated on June 25, 1982. Mazzara and White were tried separately for their involvement in the crimes.
On June 28, 1982, Hoffman pled guilty to two counts of first-degree murder, and the court agreed to sentence him to two concurrent life sentences with the conspiracy charge nolle prossed in exchange for truthful testimony against Mazzara, the man who allegedly ordered Ihlenfeld's murder. When Hoffman denied killing anyone at Mazzara's trial, the prosecution withdrew from the plea agreement and announced its intention to try Hoffman for both counts of first-degree murder.
Hoffman testified at both the guilt and penalty phases of his trial. Judgments of conviction were entered against him on January 14, 1983, on one count of first-degree murder for the murder of Frank Ihlenfeld, one count of second-degree murder for the death of Linda Parrish, and one count of conspiracy to commit murder in the first degree. On January 20, 1983, the jury recommended a sentence of death for the first-degree murder conviction by a nine-to-three vote. The trial court agreed, finding that the four aggravators found (prior conviction of violent felony; heinous, atrocious or cruel (HAC); cold, calculated and premeditated (CCP); and pecuniary gain) outweighed the mitigators found (no significant criminal history and the co-conspirator's sentence of life imprisonment). The trial court sentenced Hoffman to death for the first-degree murder on February 11, 1983.
Hoffman appealed and his convictions and sentences were affirmed by this Court. See Hoffman v. State, 474 So.2d 1178 (Fla. *177 1985).[1] This Court made the following findings: Hoffman's second-degree murder conviction was enough to substantiate a prior conviction for a violent felony; the State's withdrawal from the plea bargain and continued prosecution of Hoffman after he had reneged on his part of the agreement did not show the State purposely sought capital punishment as retribution; and life imprisonment for Hoffman's codefendants did not require finding that Hoffman's equal protection rights were violated because the death sentence was imposed.
On October 2, 1987, Hoffman filed a motion to vacate pursuant to Florida Rule of Criminal Procedure 3.850 raising, inter alia, claims under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The motion was summarily denied by the trial court on October 7, 1987. On appeal, this Court reversed and remanded, finding a remand for a full hearing was required where the trial court stated no reasons for its rejection of Hoffman's petition and failed to attach specific parts of the record in support of its summary denial. See Hoffman v. State, 571 So.2d 449 (Fla.1990). This Court also ordered the State to honor Hoffman's chapter 119 request for access to state attorney records and required the trial court give Hoffman up to thirty days to amend his 3.850 motion after receipt of any public records.
On June 17, 1991, Hoffman filed an amended motion to vacate, which was summarily denied on August 26, 1991. In response to an appeal to this Court, the State claimed that some of Hoffman's requests sought records from agencies that had nothing to do with the judgment and sentence and were agencies over which the state attorney had no control. While agreeing with the State in principle on this matter, we also determined that the state attorney should make every effort to disclose materials within its possession even if they originated in other agencies. See Hoffman v. State, 613 So.2d 405, 406 (Fla. 1992). We again remanded to the trial court for resolution of the public records issue in December 1992 and directed that our 1990 mandate be followed.
Several years of public records litigation ensued, and on January 1, 1997, Hoffman filed his second amended motion for postconviction relief. After an April 11, 1997 Huff[2] hearing, the trial court issued an order outlining the issues that would be heard at the evidentiary hearing and those that were barred.[3] The trial court found *178 three issues required an evidentiary hearing: (1) the State withheld exculpatory evidence in violation of Brady v. Maryland; (2) ineffective assistance of counsel in the guilt/innocence phase; and (3) ineffective assistance in the penalty phase. The evidentiary hearing was held on July 15, 1997. On June 29, 1998, the trial court issued an order denying relief on the three claims.
Hoffman appeals the trial court's denial of postconviction relief. He raises five issues; we find merit in the Brady claim, and reverse his conviction on this basis.[4]

BRADY VIOLATION
Hoffman claims he was entitled to a new trial because the evidence presented at the evidentiary hearing demonstrates the State withheld exculpatory evidence and there is a reasonable probability that had the defense known this information the result of the trial would have been different. We agree and remand this case to the trial court for a new trial. See Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
When a Brady violation is alleged, the defendant must establish a prima facie case that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). To meet this test, the defendant must prove: (1) the State possessed favorable evidence, including impeachment evidence; (2) the evidence was suppressed; and (3) there is a reasonable probability that, had the evidence been disclosed, the outcome would have been different. See Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 *179 (1995); Way v. State, 760 So.2d 903 (Fla. 2000).

Hair Evidence
First, Hoffman argues that the trial court erred in denying his claim that the State violated Brady by withholding the results of an exculpatory hair analysis, an analysis which excluded Hoffman, codefendant White and the male victim, Ihlenfeld, as the sources of the hairs found in the female victim's hands.[5] The State contends that in its response to a discovery request, it disclosed the existence of a hair analysis to defense counsel. This disclosure, the State asserts, should have placed Hoffman's attorney on notice of any other evidence flowing therefrom. Evidence presented at the evidentiary hearing indicates a long brown hair was found in the right hand of Ms. Parrish, and hairs were found in the clutch of her left hand. Evaluation by the FDLE showed these hairs were Caucasian male head and pubic hairs that did not match that of the defendant. Additionally, the head hair did not match that of the male victim.
Hoffman argues this evidence was not available to defense counsel at trial because the report was not disclosed. The record indicates the defense filed a demand for discovery on November 5, 1981. The State answered the demand on November 6, 1981, and indicated there were scientific reports available concerning the autopsy, fingerprinting, blood analysis, and hair analysis. However, the report which indicated the Caucasian hair found in the female victim's hand did not match Hoffman's hair was not done until February 11, 1982. There is no indication that the State ever disclosed this report to the defense, and the State does not argue that this report was disclosed. Instead, the State essentially argues that defense counsel should have inquired further once told of the existence of other hair analyses.
The State's additional argument is that defense counsel Harris elicited information at trial from a serologist about the hairs. The information solicited, however, was merely the fact that hairs were gathered at the scene. The State asserts this testimony sufficiently apprised the defense of the existence of this evidence. This argument is flawed in light of Strickler and Kyles, which squarely place the burden on the State to disclose to the defendant all information in its possession that is exculpatory. In failing to do so, the State committed a Brady violation when it did not disclose the results of the hair analysis pertaining to the defendant.
However, in order to be entitled to relief based on this nondisclosure, Hoffman must demonstrate that the defense was prejudiced by the State's suppression of evidence. See Strickler, 527 U.S. at 280-82, 119 S.Ct. 1936. To make this determination, the suppressed evidence must be viewed in context with the other evidence that was presented at trial. The evidence at trial which tended to inculpate the defendant was a fingerprint lifted from a cigarette pack found at the scene matching Hoffman's fingerprint. The jury could have believed Hoffman was present at the scene of the crime based on this evidence. However, of saliva samples taken from cigarette butts found at the scene, none matched Hoffman's type AB blood.[6] The jury could also have believed, based on this evidence, that Hoffman was not in that motel room, but that one of his acquaintances *180 who was present had Hoffman's cigarette pack or a cigarette pack Hoffman had touched at some point. Since Merrill, Mazzara, Hoffman and White all worked for the Provost organization, such a scenario is not an impossibility.
The other evidence linking Hoffman to the crime was his confessions to FBI agents and Jacksonville Beach Police officers. Hoffman argued at trial that he never made the Jackson, Michigan confession. Additionally, he argued the unrecorded statements given to the Jacksonville Beach police officers resulted from his drug addiction and did not contain any information that had not been published in the papers and known to everyone. Moreover, at the evidentiary hearing, Hoffman presented evidence that another suspect also confessed to the crimes.
Whether Hoffman was in fact in that motel room was an important issue that the jury had to resolve. Therefore, any evidence tending to either prove or disprove this fact would be highly probative. Hair evidence found in the victim's clutched hand could tend to prove recent contact between the victim and a person present in that room at the time of her death. With the evidence excluding Hoffman as the source of the clutched hair, defense counsel could have strenuously argued that the victim was clutching the hair of her assailant, but that assailant was not Hoffman.
Given the circumstances of this case, there is a reasonable probability, had the evidence been disclosed, that the outcome would have been different. See United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Therefore, the defendant is entitled to a new trial based on this Brady violation.

Nondisclosure of Deal with George (Rocco) Marshall
Hoffman also argues that the nondisclosure of certain aspects of Marshall's deal with the State served to bolster his testimony against Hoffman. It does not appear from the record that any evidence about Marshall's deal was in fact withheld. Former defense counsel Harris testified at the evidentiary hearing that he could not say if the State had disclosed evidence regarding Marshall, his deal with the police, or his connection to the Provost organization. When asked if he would have presented evidence of Marshall and the victim being involved in the same drug organization, Mr. Harris responded, "Possibly, yes. I don't know." At trial, Harris was able to elicit unfavorable testimony from Marshall about himself, including his drug use and dealing and his initial denial when asked by the police if he knew anything about these murders. Once offered a deal, he implicated Hoffman. This negative character information was used to diminish Marshall's credibility in the eyes of the jurors. However, despite this information, the jurors convicted the defendant of these crimes and recommended a sentence of death for Hoffman.
In denying relief on this claim, the trial judge said:
The identity of Rocco Marshall and the extent of his knowledge about this case were well known to the defense throughout the discovery and pretrial stages of the case. The defendant's trial counsel vigorously cross-examined Mr. Marshall at trial and established a number of effective points which might damage his credibility with a jury. These facts could only have been known to defense counsel at trial as the result of adequate, and indeed thorough, pretrial discovery. The specific circumstances of his incentives to testify were well known to the defense, and were talked about at trial.
These findings are supported by the record and demonstrate that Hoffman is not *181 entitled to relief on this issue. Hoffman has failed to demonstrate that any material evidence concerning Marshall was withheld.

Evidence Regarding Other Suspects
Third, Hoffman argues that the State withheld, to his detriment, evidence about the existence of other suspects. Hoffman contends that information concerning Bubba Jackson, Bones Merrill, Clarence Robinson and Meade Haskins was withheld. At the evidentiary hearing, trial counsel answered in the negative when asked if the State had disclosed Bubba Jackson's confession to the murders. Counsel also replied he was unaware that Jackson had told a friend, David Jack, that he had broken off a knife in Mr. Ihlenfeld's back. Counsel explained that in light of the fact that the blade of a knife had been found in Ihlenfeld's back, he would have presented that evidence to the jury. Counsel was not questioned about the other individuals named above.
As the State points out, the prosecution is not required to give the defendant all information regarding its investigatory work on a particular case. In fact, as stated in Medina v. State, 690 So.2d 1241, 1249 (Fla.1997), "Brady does not require disclosure of all information concerning preliminary, discontinued investigations of all possible suspects in a crime." The State argues that trial counsel was aware that there were other suspects in the case based upon testimony at trial. Detective Dorn testified at the evidentiary hearing that only after the investigation of other suspects were the police led to Hoffman and codefendant White.
The State does not argue that the reports concerning the investigation of other suspects were disclosed. Instead the State relies on the general proposition that the State is not required to give the defense all of its investigative information in order to satisfy the requirements of Brady. See Medina; Spaziano v. State, 570 So.2d 289 (Fla.1990); and Swafford v. Dugger, 569 So.2d 1264 (Fla.1990). Although this is generally true, under the circumstances of this case, where another person has also confessed to the crime, the State should have disclosed that information to the defense. There is a reasonable probability that the result of the trial would have been different had the jury heard that another suspect had confessed and the hair in the victim's hand did not belong to Hoffman.

Blood Analysis
Hoffman complains that the blood types of the other suspects were not revealed by the State. However, during the evidentiary hearing, trial counsel admitted to being aware that there was blood found at the scene of the crime that was inconsistent with Hoffman's and White's. The testimony of the serologist at trial, including defense counsel's cross-examination, all revealed that the blood found at the scene did not match others who were involved or suspected of involvement in these murders.[7] Hoffman did not show at the evidentiary hearing that the State did in fact withhold any information regarding this blood or that the information was exculpatory. Thus, Hoffman has not demonstrated a violation of Brady.

Hoffman's Post-Plea Statements
Lastly, Hoffman contends that trial counsel was denied access to records of Hoffman's post-plea statements. During a hearing on December 21, 1982, defense counsel moved for rehearing of a motion to *182 suppress Hoffman's statements that had initially been argued and denied on June 25, 1982. A rehearing was held on January 10, 1983, where defense counsel argued that any incriminating statements made by Hoffman to the prosecutor should be suppressed because they were made without the assistance of counsel and while Hoffman was under the influence of drugs. The prosecutor agreed not to use those statements at trial and, in fact, refrained from doing so during the trial. The record reflects that these statements were not only known to defense counsel but were not used in any manner that would have prejudiced Hoffman.[8] For these reasons, relief on this claim is denied.

Conclusion
We find that the Brady violation pertaining to the nondisclosure of hair evidence and the confession of another person to these crimes severely compromised Hoffman's right to a fair trial and requires reversal of the trial court's ruling and Hoffman's convictions. Hoffman's remaining claims are rendered moot by our decision on the Brady issue and do not require further discussion here. We reverse the trial court's denial of Hoffman's motion for post-conviction relief and direct that his conviction be set aside. We also remand this case for a new trial.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
NOTES
[1] Hoffman raised the following issues on appeal: (1) the trial court erred in denying his motion to suppress his confession; (2) the trial court erred in excusing for cause certain veniremen because of their views on capital punishment; (3) the prosecuting attorney made improper arguments to the jury; (4) the trial court erroneously found the previous conviction of a felony and CCP aggravators without any pretense of moral or legal justification; (5) the trial court erred in considering the manner of Ms. Parrish's death to support the finding of the previous felony aggravator; (6) the HAC aggravator was not supported by the circumstances of the murder; (7) the State improperly sought the death penalty to punish Hoffman for not giving testimony against a codefendant; (8) defendant's sentence of death was unfair since his codefendants each received life sentences.
[2] Huff v. State, 622 So.2d 982 (Fla.1993).
[3] The procedurally barred issues included: claim IHoffman was denied the right to counsel and to effective assistance of counsel at critical stages of the proceeding; claim III (raised on direct appeal)Hoffman could not give a knowing and intelligent waiver of his Miranda rights because of a mental impairment that prevented him from comprehending instructions; claim VI (raised on direct appeal and found to lack merit)the prosecutor's arguments so infected the proceedings with unfairness as to render the resulting death sentence unreliable; claim VII (should have been raised on direct appeal)CCP was applied to this case in violation of the Eighth and Fourteenth Amendments; claim VIII (should have been raised on direct appeal) (a) the judge showed bias regarding the mitigating factors by belittling their significance; (b) the prosecutor failed to honor two stipulations; claim IX (should have been raised on direct appeal)the jury was misled by statements that diluted their responsibility for sentencing (Caldwell claim); claim Xcontinued suppression of public records (the circuit court has ruled on all public record requests filed by the defendant; this issue has been resolved); claim XI (should have been raised on direct appeal)penalty phase jury instruction improperly shifted the burden to defendant to prove death penalty was inappropriate; claim XII (raised on direct appeal and found to lack merit)the trial judge's application of HAC in post-penalty phase denied Hoffman a fair trial.
[4] Hoffman also claims the trial court erred in denying (1) his ineffective assistance of counsel at penalty phase claims; (2) his ineffective assistance of counsel at the guilt phase claim; (3) further disclosure of public records pursuant to chapter 119; (4) an evidentiary hearing on these claims: (a) whether there was a knowing, intelligent waiver of Miranda rights; (b) denial of right to counsel and effective assistance at critical stages of the proceedings; (c) prosecutor's closing arguments infected proceedings with unfairness rendering the sentence fundamentally unreliable and unfair; (d) CCP was incorrectly applied; (e) trial counsel was ineffective at penalty phase for failing to object to judge's improper instruction on pretrial stipulations and judicial bias in determining mitigators; (f) the jury was misled by instructions and arguments diluting their sense of responsibility for sentencing in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and Mann v. Dugger, 844 F.2d 1446 (11th Cir.1988); (g) penalty phase instructions improperly shifted burden to Hoffman to prove death was inappropriate; (h) judge's post-penalty application of HAC denied Hoffman right to fair trial. These issues are not discussed because they have been rendered moot by our disposition based on the Brady claim.
[5] The hair was also excluded as belonging to the female victim.
[6] None of the blood found at the scene or on the victims' clothing matched Hoffman's blood type.
[7] The record indicates that Hoffman has type AB blood, James White has type A blood, Bubba Jackson has type A blood, Linda Parrish had type A blood, and Ihlenfeld had type B blood. The blood type retrieved from the cigarette butt and Ihlenfeld's jeans was type O.
[8] Moreover, the prosecutor testified at the evidentiary hearing that his conversations with Hoffman were not recorded and no notes were taken. He also indicated he discussed the substance of those conversations with defense counsel, and he said defense counsel had copies of depositions given by Hoffman to the attorneys for White and Mazzara in which Hoffman confessed to his involvement in both murders.