986 So.2d 501 (2008)
Richard W. RHODES, Appellant,
v.
STATE of Florida, Appellee.
No. SC04-31.
Supreme Court of Florida.
March 13, 2008.
As Modified on Denial of Rehearing July 3, 2008.
*503 Terri L. Backhus of Backhus and Izakowitz, P.A., Tampa, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, Florida, and Robert J. Landry and Katherine V. Blanco, Assistant Attorneys General, Tampa, FL, for Appellee.
PER CURIAM.
Richard Rhodes was convicted of first-degree murder and sentenced to death. *504 We affirmed his conviction, see Rhodes v. State, 547 So.2d 1201 (Fla.1989), and later his sentence, see Rhodes v. State, 638 So.2d 920 (Fla.1994). He now appeals an order of the circuit court denying a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons discussed below, we affirm the circuit court's order denying the motion on all issues.

I. FACTS AND PROCEDURAL HISTORY
Rhodes was convicted of first-degree murder for the manual-strangulation death of a woman, later identified as Karen Nieradka. The facts of the crime, as we have previously described them, are briefly summarized here.[1] Nieradka's decomposing body was found on March 24, 1984, in debris being used to construct a berm in St. Petersburg. The debris came from a hotel in Clearwater, which had been demolished nine days earlier. The cause of death was determined to be manual strangulation, causing the hyoid bone in Nieradka's neck to break. Although the only clothing found on her body was a brassiere around her neck, no physical evidence of sexual battery was found.
On March 2, 1984, the Florida Highway Patrol stopped Rhodes in Hernando County; he was driving a car registered to the victim. After the body was identified, Rhodes was questioned and ultimately arrested for the murder. During the various interviews, Rhodes gave different and sometimes conflicting statements, ultimately claiming that the victim died accidentally when she fell from the third floor of the Sunset Hotel.
During the original trial, three of Rhodes's former cellmates at the Pinellas County Jail testified that Rhodes admitted killing the victim. The jury found Rhodes guilty of first-degree murder and recommended that he be sentenced to death. The trial judge followed the recommendation. On appeal, we affirmed the conviction. However, because of various penalty phase errors, we vacated the death sentence and remanded for a new sentencing. Rhodes v. State, 547 So.2d at 1201.
On remand, a newly empaneled jury recommended death by a vote of ten to two. The trial court followed the jury recommendation. In aggravation, the sentencing judge found that: (1) Rhodes committed the murder while on parole; (2) Rhodes was previously convicted of a violent felony; and (3) Rhodes committed the murder while committing an attempted sexual battery. In mitigation, he found: (1) Rhodes's age of thirty at the time of offense; and (2) Rhodes's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The judge refused to find that at the time of the murder Rhodes was under the influence of extreme mental or emotional disturbance or that he was under extreme duress due to alcohol consumption and his family history. However, he did find as nonstatutory mitigation that: (1) as a child, Rhodes was abandoned by his parents; and (2) Rhodes never experienced a normal family life because as a child he was never placed in a social environment that could address his needs and he spent most of his life in state hospitals and prisons.
Rhodes appealed his resentencing, raising eight issues.[2] We affirmed the sentence but agreed that the March 20, 1992 *505 conviction for first-degree murder was extraneous in light of our affirmance of Rhodes's 1985 conviction; we vacated the March 1992 conviction. Rhodes, 638 So.2d at 927.
Rhodes filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850, in which he raised several claims and subclaims.[3] The trial court held an evidentiary hearing on some of the *506 issues, but subsequently denied relief on all claims.

II. ANALYSIS
Rhodes raises four claims on appeal: (A) that the State withheld material and exculpatory evidence and knowingly presented false or misleading evidence; (B) that resentencing counsel was ineffective in his investigation and presentation of mitigation evidence; (C) that the trial court erred in denying his motion to depose the State's DNA expert; and (D) that the trial court erred in summarily denying several of his postconviction claims. We address each in turn.

A. BRADY/GIGLIO VIOLATIONS
Rhodes first contends that the State violated Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). His claims stem from hair evidence examined by, and testimony taken from, FBI Agent Michael Malone. Rhodes first contends that the trial court erred in denying his claim that the State violated Brady by failing to disclose material exculpatory hair evidence. He also argues that the State violated Giglio by knowingly presenting Agent Malone's testimony when it was in fact false. We discuss each claim in turn.

1. The Brady Claim
Rhodes contends that the State violated Brady by failing to disclose that Agent Malone falsely testified about exculpatory hair evidence found in the victim's hand. Agent Malone had analyzed the hairs found on various items of evidence and compared them to known hair samples taken from Rhodes and the victim. He testified that all of the unknown hairs given to him from the victim, or from the area where the victim was found, microscopically matched the victim's hair or were hairs that were "basically no good." Agent Malone explained that the hairs that were "no good" were just hair fragments that could not be identified and therefore could not be linked to anyone. Agent Malone testified that "the bottom line as far as the hair from the victim or area where she was found is that there were no foreign hairs at all." A foreign hair was identified as "a hair that originates from somebody else besides the victim."
On cross-examination, defense counsel highlighted the insignificance of Agent Malone's testimony, stating "Mr. Malone, is the bottom line you can't help us out in this case at all?" Agent Malone answered, "Well, there were no other hairs except hairs of the victim that I could come up with, yes. That's about it."
About sixteen years later, Agent Malone admitted that he falsely testified at trial that the hair evidence in the victim's left hand was hers. Agent Malone was called to testify at Rhodes's postconviction evidentiary *507 hearing. On the morning he was scheduled to testify, Agent Malone admitted, after checking his handwritten bench notes, that the hair in the victim's left hand, which he originally identified as belonging to the victim, was in fact not suitable for testing. Rhodes argues that there is a reasonable probability that the outcome of the proceedings would have been different had this evidence been disclosed to him. See Giglio, 405 U.S. at 154, 92 S.Ct. 763; Brady, 373 U.S. at 87, 83 S.Ct. 1194.
In Brady, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. To establish a Brady violation, the defendant must demonstrate that (1) the evidence was favorable to the defendant, either because it was exculpatory or because it was impeaching; (2) it was suppressed by the State, either willfully or inadvertently; and (3) it was material, thereby causing prejudice to the defendant. See Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).
Agent Malone's trial testimony concerning the hair in the victim's left hand was admittedly false. The trial court denied the claim, however, because the false testimony was neither withheld, favorable to the accused, nor prejudicial. Giving deference to the trial court on questions of fact, we review de novo the application of the law, and independently review the cumulative effect of the suppressed evidence. See Green v. State, 975 So.2d 1090, 1101-1102 (Fla.2008) (citing Mordenti v. State, 894 So.2d 161, 169 (Fla.2004); Way v. State, 760 So.2d 903, 913 (Fla.2000)).
We agree with the trial court that Agent Malone's testimony was not favorable to Rhodes. Favorable evidence encompasses both exculpatory evidence and evidence that impeaches the testimony of a witness when the reliability or credibility of that witness may determine guilt or innocence. See United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Giglio, 405 U.S. at 153, 92 S.Ct. 763. Agent Malone testified, both at the original trial and the evidentiary hearing, that he was unable to identify any hairs other than those belonging to the victim. The only difference between his original testimony and his postconviction testimony was that a hair located in the victim's left hand was found not suitable for testing. Notwithstanding that error, Agent Malone's ultimate conclusionthat all of the identifiable hairs recovered from the victim's body, or the immediately surrounding area, belonged to the victimremained unchanged. Because all of the identifiable hairs belonged to the victim, the hair evidence neither inculpated nor exculpated Rhodes. The change in Agent Malone's testimony could not be used to impeach Malone or exonerate Rhodes and therefore does not warrant relief under Brady.
Even assuming that the evidence was favorable, however, the hair evidence was neither suppressed nor prejudicial. The Brady rule only applies to "the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Here, it is undisputed that both the State and defense counsel were apprised of the error in Agent Malone's testimony at the evidentiary hearing on Rhodes's postconviction motion. In fact, Agent Malone did not become aware of the discrepancy between his trial testimony and his notes until preparing *508 to testify on the morning of the hearing. Without demonstrating that the State suppressed evidence, Rhodes is not entitled to relief under Brady.
Finally, Agent Malone's testimony did not prejudice Rhodes. To satisfy Brady's prejudice prong, a defendant must show that the suppressed evidence was material. Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Evidence is material if there is "a reasonable probability that had the suppressed evidence been disclosed the jury would have reached a different verdict. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Green, 975 So.2d at 1102 (citation omitted). A new trial is only warranted when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. (quoting Strickler, 527 U.S. at 290, 119 S.Ct. 1936). Here, Agent Malone's testimony could not reasonably place the case in such a different light as to undermine confidence in the verdict. His testimony did not exclude either Rhodes or the victim as the source of the unidentifiable hairs. Further, subsequent DNA testing on the hair evidence proved inconclusive and therefore, again, did not exculpate Rhodes.
We denied Brady relief under similar circumstances in Allen v. State, 854 So.2d 1255 (Fla.2003). In Allen, we found that a forensic hair analysis the State had withheld was not material, even though it excluded the defendant as a source of the hair, because the analysis did not exclude the victim as the source and therefore neither supported nor negated the defendant's argument that an unidentified person perpetrated the murder. Id. at 1260. Similarly, the change in Agent Malone's testimony does not support or negate Rhodes's contention that an unidentified third party committed the murder. In other words, the fact that Agent Malone incorrectly identified a hair not suitable for testing as belonging to the victim does not present Rhodes with new evidence from which he could present a plausible and persuasive theory of innocence. Thus, we conclude that even given the benefit of Agent Malone's amended testimony, no prejudice has been established.
Contrary to Rhodes's suggestion, this case is distinguishable from our decision in Hoffman v. State, 800 So.2d 174 (Fla.2001). In Hoffman, the State failed to disclose the results of an exculpatory hair analysis. We ordered a new trial. An important issue in the case was whether the defendant was even present at the crime scene. Id. at 180. Therefore, "any evidence tending to prove or disprove [that] fact would be highly probative." Id. Unlike the evidence in this case, however, the evidence in Hoffman excluded the defendant as the source of the hair, as well as the victim and the codefendant. Id. at 179. Hair found clutched in the victim's hand provided proof of recent contact between the victim and a person present at the crime scene when the victim died. Id. We found that defense counsel could have strenuously argued that the defendant was not present at the crime scene and was not the assailant. Id. at 180. The hair evidence in this case does not have the same probative value; it is not exculpatory.
Based on the above, we agree with the trial court that Rhodes failed to establish a Brady violation.

2. The Giglio Claim
The trial judge also concluded that Rhodes did not prove that the State knowingly presented false testimony at trial from Agent Malone, in violation of Giglio. To establish a Giglio violation, a defendant must show that: (1) the prosecutor presented or failed to correct false testimony; *509 (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. See Guzman v. State, 941 So.2d 1045, 1050 (Fla.2006). Once the first two prongs are established, the false evidence is deemed material if there is any reasonable possibility that it could have affected the jury's verdict. See id. Under this standard, the State has the burden to prove that the false testimony was not material by demonstrating it was harmless beyond a reasonable doubt. Id.; see also Mordenti v. State, 894 So.2d 161, 175 (Fla.2004).
Rhodes argues that Agent Malone falsely testified concerning the number of hairs he examined and the identity of the hairs in the victim's left hand. The trial court found that Agent Malone admitted to falsely testifying as to the numbers of hairs he tested and the identity of hairs clutched in the victim's hands; however, it denied relief because the State did not knowingly present the false evidence and because it was not material.
We find that competent substantial evidence supports the conclusion that Agent Malone falsely testified about the hair clutched in the victim's left hand; however, the record does not support the court's conclusion that Agent Malone testified falsely about the quantity of hairs tested.[4]See Green, 975 So.2d at 1101 (noting that we defer only to those factual findings supported by competent, substantial evidence and review de novo the application of the law to the facts). Notwithstanding the falsity of the testimony, we affirm the trial court's denial of Rhodes's Giglio claim because even if Rhodes satisfied the first two prongs under Giglio, he cannot demonstrate that Agent Malone's testimony was material. Agent Malone's testimony helped neither the State nor the defense. Forensic testing of the hair evidence at the time of trial, and later during Rhodes's postconviction proceeding, revealed that the hair evidence collected on or around the victim's body either belonged to the victim or was inconclusive. As the trial court found, "the inconclusive test results do not exclude the Defendant, the victim or a third person as a potential source of the hair." Because the hair evidence did not identify or exclude Rhodes as a source, it did not exonerate Rhodes or inculpate a third party. Therefore, Agent Malone's false testimony concerning the hair evidence was not sufficiently material and thus there is no "reasonable possibility that [it] could have affected the judgment of the factfinder." Guzman, 941 So.2d at 1051. As defense counsel aptly stated during trial, the "bottom line [is Agent Malone] can't help us out in this case at all." Accordingly, we deny relief on this issue.

B. INEFFECTIVE ASSISTANCE OF RESENTENCING COUNSEL
Rhodes next argues that his resentencing counsel failed to fully investigate or prepare his mitigation. Specifically, Rhodes contends counsel failed to locate and call witnesses who would have testified about Rhodes's abusive childhood.[5] Although *510 we recognize that "the obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated," and that attorneys have a "strict duty to conduct a reasonable investigation of a defendant's background for possible mitigating evidence," Davis v. State, 875 So.2d 359, 369 (Fla.2003) (quoting State v. Lewis, 838 So.2d 1102, 1113 (Fla.2002), and Ragsdale v. State, 798 So.2d 713, 716 (Fla. 2001)), we find Rhodes's claim is without merit.
To prevail on a claim of ineffective assistance of counsel, Rhodes must show: (1) that his counsel's performance was deficienti.e., unreasonable under prevailing professional norms; and (2) that the deficiency prejudiced the defensei.e., that it undermines confidence in the outcome of the trial by creating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Valle v. State, 778 So.2d 960, 965-66 (Fla.2001) (quoting Williams v. Taylor, 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)); see also Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
Here, a determination of whether counsel was ineffective requires an examination not only of counsel's alleged failure to investigate and present possibly mitigating evidence, but the reasons for doing so. See Rose v. State, 675 So.2d 567, 571 (Fla. 1996); see also Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (quoting Strickland, 466 U.S. at 690-91, 104 S.Ct. 2052)). Moreover, Rhodes must demonstrate that counsel's performance actually "deprived the defendant of a reliable penalty phase proceeding." Rutherford v. State, 727 So.2d 216, 223 (Fla.1998).
Rhodes contends that resentencing counsel was deficient for failing to call several family members and Lorraine Armstrong, a nurse at the state hospital where Rhodes resided for a portion of his youth. Rhodes contends that sufficient evidence of childhood abuse would have resulted in substantial mitigation and the imposition of a life sentence. The circuit court concluded that Rhodes proved neither deficient performance nor prejudice. We agree.
At resentencing, counsel called Dr. Donald Taylor and James Rhodes. After examining and evaluating Rhodes, Dr. Taylor concluded that Rhodes "is probably the most severely abused and neglected person that I've ever come across." Dr. Taylor explained that Rhodes was born to two migrant workers, who both physically and sexually abused him when he was under the age of five. When Rhodes was five years old, his parents abandoned him and his two brothers. From that point on, Rhodes resided in several different foster and boys' homes. When he was about nine, Rhodes was returned to his father, who again physically and sexually abused him. At age ten, he was permanently removed from his father's home. Two years later, he was placed in the psychiatric unit at Napa State Hospital, where he stayed until he was eighteen.
Dr. Taylor opined that Rhodes was severely emotionally disturbed and that during the commission of the first-degree murder, he was under the influence of extreme mental or emotional disturbance. *511 Dr. Taylor also opined that at the time of the offense Rhodes was under duress and his ability to conform his conduct to the requirements of the law was substantially impaired.
Rhodes's brother James corroborated much of Dr. Taylor's testimony and relayed a first-hand account of his and Rhodes's upbringing. Specifically, James testified that his parents were alcoholics and abandoned them when they were young. James characterized his mother as "a very sick woman;" James testified that six years before his testimony, his mother visited him and "the first thing she wanted to do was go to bed with him." James also testified that Rhodes confided in him that he had been sexually abused. James explained that as kids they suffered from malnutrition and went very long periods without adult supervision. James recounted that Rhodes spent roughly five years in Napa State Hospital's psychiatric ward, and after being institutionalized Rhodes did not communicate well with others and exhibited social difficulties. James opined that Rhodes's upbringing had a lot to do with his current situation.
Based on this testimony, the resentencing court found that Rhodes's capacity "to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired." As support, the trial court stated:
The Defendant's background is a laundry list of experiences that almost predicate a life of crime and violence. He was abandoned at a young age by both his parents, although he later spent some time with his natural father. He was certainly neglected and there was some evidence that he had been sexually abused. As a child he was hyperactive and diagnosed as having a character disorder. He grew up in various foster homes. There was little or no stability to his existence since he would cause such problems in the household that he would have to be removed. During his youth there was a history, reflected in the records introduced at the Penalty Phase, of killing animals, sexual play with children, and compulsive lying. Unable to coexist in the home of his father and stepmother, or foster homes, the Defendant was eventually placed in Napa State Hospital in California. There he remained from the time he was twelve until he turned eighteen.
The court also considered as nonstatutory mitigation the fact that Rhodes was abandoned, had an abnormal family life, and was never deinstitutionalized for more than a few months at a time.
At the evidentiary hearing below, Rhodes's postconviction counsel presented three witnesses to demonstrate other evidence that could have been offered during the penalty phase: Eileen Meis, Lorraine Armstrong, and Kenneth Rhodes. Although this additional testimony presented greater detail about Rhodes's abusive childhood, it contributed virtually nothing new and was cumulative of the testimony presented during the second penalty phase. See Gudinas v. State, 816 So.2d 1095, 1105-06 (Fla.2002) (finding that trial counsel was not ineffective for failing to present mitigation evidence cumulative to that presented at the penalty phase).
Notwithstanding the cumulative nature of the testimony, we review whether resentencing counsel was deficient in failing to present the additional witness testimony. In analyzing whether counsel was deficient in failing to investigate and present mitigating evidence, we first determine "whether a reasonable investigation should have uncovered such mitigating evidence. If so, then a determination must be made whether the failure to put this evidence before the jury was a *512 tactical choice by trial counsel." Gudinas, 816 So.2d at 1104 (quoting Middleton v. Dugger, 849 F.2d 491, 493 (11th Cir.1988)). If counsel's failure to present the mitigating evidence was an oversight, and not a tactical decision, "then a harmlessness review must be made to determine if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Thus, it must be determined that defendant suffered actual prejudice due to the ineffectiveness of his trial counsel before relief will be granted." Id. (quoting Middleton, 849 F.2d at 493).
Rhodes contends that resentencing counsel should have investigated the additional witnesses mentioned above because their names appeared somewhere in his medical records. While it is true that these witnesses' names were scattered throughout Rhodes's voluminous records, there was no testimony demonstrating that Rhodes told resentencing counsel that he wanted these witnesses contacted. Strickland, 466 U.S. at 691, 104 S.Ct. 2052 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."). Moreover, as the postconviction court noted, none of these witnesses testified at Rhodes's first sentencing hearing and there is no indication that Rhodes's original trial counsel considered the above people as possible defense witnesses.
Therefore, we agree with the trial court's conclusion that "it is simply not reasonable for an attorney to attempt to ascertain the identity and relationship of each and every person named in defendant's records, attempt to determine if that person is living, attempt to locate and contact that witness, and finally, determine if that person would be able to provide favorable testimony."
Moreover, resentencing counsel made a strategic choice not to call other identified witnesses. For example, counsel testified that he refrained from calling prison ministry personnel because he did not want the jury to realize that Rhodes had previously been sentenced to death.[6]See Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000) ("Counsel cannot be deemed ineffective merely because current counsel disagrees with trial counsel's strategic decisions.") (citing Strickland, 466 U.S. at 689, 104 S.Ct. 2052 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight....")).
Even if we were to find counsel's conduct deficient, Rhodes cannot demonstrate prejudice. Any testimony the additional witnesses would have provided would have been cumulative to that provided by the witnesses at resentencing. As discussed above, trial counsel are not ineffective for failing to present cumulative evidence. See Marquard v. State, 850 So.2d 417, 429-30 (Fla.2002) ("[C]ounsel is not required to present cumulative evidence."). Moreover, the cumulative mitigation testimony would not have outweighed the State's evidence in aggravation. See, e.g., Bell v. State, 965 So.2d 48 (Fla.2007) (finding that the defendant did not demonstrate the prejudice prong because the unpresented penalty phase testimony could not have countered the quantity and quality of the aggravating evidence); see also Gaskin v. State, 737 So.2d 509, 516 n. 14 (Fla.1999) ("Prejudice, *513 in the context of penalty phase errors, is shown where, absent the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different or the deficiencies substantially impair confidence in the outcome of the proceedings."). The additional testimony would only have added to the mitigation already found. Even if given more weight, the mitigation would not outweigh the three strong aggravators: (1) Rhodes committed the murder while on parole; (2) Rhodes was previously convicted of a violent felony; and (3) the murder was committed while Rhodes was engaged in the commission of an attempted sexual battery.

C. MOTION TO DEPOSE DNA EXPERT
Rhodes next argues that the trial court erred in denying his motion to depose the State's DNA expert. We do not decide this issue because it was not preserved. While Rhodes filed a motion to depose the State's DNA expert, he did not obtain a ruling. Absent fundamental error, an appeal may not be taken from a trial court's judgment or order unless properly preserved. See § 924.051(3), Fla. Stat. (2006). To be preserved, the issue or legal argument must be raised and ruled on by the trial court. See § 924.051(1)(b); see also Philip J. Padovano, Florida Appellate Practice, § 8.1, at 148 (2007 ed.) ("The aggrieved party must obtain an adverse ruling in the lower tribunal to preserve an issue for review. The appellate courts review only the decisions of lower tribunals.... Without a ruling or decision, there is nothing to review."). Further, without a ruling, it is difficult to ascertain whether the trial court abused its discretion in denying Rhodes's discovery request. See Panda Energy Int'l v. Jacobs, 813 So.2d 46, 49 (Fla.2002) (holding that postconviction discovery decisions are within the trial court's authority and are reviewed for an abuse of discretion). Thus, because Rhodes failed to follow the well-established practice requiring a party to secure a ruling on its motion before seeking appellate review, he waived the issue. See Rose v. State, 787 So.2d 786, 797 (Fla.2001) ("The failure of a party to get a timely ruling by a trial court constitutes a waiver of the matter for appellate purposes."); Richardson v. State, 437 So.2d 1091, 1094 (Fla.1983) (noting that appellant, having failed to pursue or obtain a ruling on his motion, did not preserve the issue for appeal); Carratelli v. State, 832 So.2d 850, 856 (Fla. 4th DCA 2002) (listing the "plethora of Florida cases" supporting the notion that a party must obtain a ruling from the trial court in order to preserve an issue for appellate review).

D. CLAIMS DENIED WITHOUT AN EVIDENTIARY HEARING
Rhodes argues that the trial court summarily denied various claims of ineffective assistance of counsel which he argues warranted an evidentiary hearing. We disagree.
This Court reviews the summary denial of 3.850 claims under the following standard: "To uphold the trial court's summary denial of claims raised in a 3.850 motion, the claims must be either facially invalid or conclusively refuted by the record. Further, where no evidentiary hearing is held below, we must accept the defendant's factual allegations to the extent they are not refuted by the record." Foster v. State, 810 So.2d 910, 914 (Fla. 2002) (quoting Peede v. State, 748 So.2d 253, 257 (Fla.1999)).
"To be entitled to an evidentiary hearing on a claim of ineffective assistance, the defendant must allege specific facts that are not conclusively rebutted by the *514 record and which demonstrate a deficiency in performance that prejudiced the defendant." Jones v. State, 845 So.2d 55, 65 (Fla.2003). "Failure to sufficiently allege both prongs results in a summary denial of the claim." Spera v. State, 971 So.2d 754, 758 (Fla.2007) (citing Thompson v. State, 796 So.2d 511, 514 n. 5 (Fla.2001)).
Rhodes argues that the trial court improperly denied him an evidentiary hearing on several claims of ineffective assistance of guilt phase and resentencing counsel.[7] We conclude that the trial court was correct in summarily denying these claims either because the record refutes the allegations; because, assuming the facts are true, Rhodes cannot demonstrate any deficiency on the part of counsel; or because, again assuming the facts are true, any deficiency is insufficient to undermine our confidence in the outcome.[8]

CONCLUSION
For the reasons stated, we affirm the trial court's denial of Rhodes's motion for postconviction relief.
It is so ordered.
WELLS, ANSTEAD, PARIENTE, CANTERO, and BELL, JJ., concur.
LEWIS, C.J., concurs in part and dissents in part with an opinion.
QUINCE, J., recused.
*515 LEWIS, C.J., concurring in part and dissenting in part.
While I agree with all other aspects of the majority decision, I cannot agree that the alleged error with regard to the motion to depose the State's DNA expert is appropriately considered as part of the instant appeal from the denial of the rule 3.850 motion. Strangely, Rhodes filed the motion to depose during the evidentiary hearing for the rule 3.850 motion. Specifically, the motion to depose was filed after closing arguments but prior to the trial court's order that denied the rule 3.850 motion for relief. Notwithstanding the timing of this filing, Rhodes conceded in the motion to depose that the "DNA issue is a separate matter from the issues that are already before this Court in closing argument." Additionally, the trial court had previously agreed with Rhodes that the two issues were distinct: "[T]he DNA deal is apparently going to be a separate deal from the three, you know, 850, anyway." Thus, the record establishes that both the trial court and Rhodes operated under the belief that the DNA testing and subsequent discovery with regard to that testing was a separate issue from the rule 3.850 motion. The trial court apparently decided not to rule immediately on the motion to depose because the rule 3.850 proceeding had not yet concluded. Therefore, in my view, the alleged error with regard to the motion to depose is beyond the scope of the instant appeal from the denial of the rule 3.850 motion. The majority's improper consideration of this claim and its holding that Rhodes "waived the issue" should not hinder any future attempt by him to seek further review of this claim.
Moreover, I conclude that the trial court should be directed to rule on the motion to depose the State's DNA expert. The majority correctly recognizes that the failure of the trial court to rule on this motion presents a current impediment for this Court to review the claim, but then, strangely, does not direct the trial court to remove this obstacle. Regardless of the fact that the motion to depose was filed during the rule 3.850 proceeding, Rhodes was entitled to a ruling on this motion at some later point in time. There is nothing within the record which establishes that Rhodes made any affirmation to the trial court that indicated a desire to waive this motion. Thus, the failure of the trial court to rule on the motion to depose after the conclusion of the rule 3.850 proceeding was likely a mere oversight, which supports that the trial court should be directed to rule on this motion. See Miller v. Miller, 709 So.2d 644, 645 (Fla. 2d DCA 1998) (remanding for the trial court's disposition of a pending counterpetition after concluding "that its omission from the order under review was an oversight" (emphasis added)).
For any future appeal, the lack of an order on the motion to depose would create the same obstacle that the majority encounters when it erroneously attempts to provide review of the claim under the instant rule 3.850 appeal. The options available to Rhodes to seek further review of this claim should not be limited by the fact that the trial court failed to issue an order on the motion to depose after the conclusion of the rule 3.850 proceeding. See State v. Fourth Dist. Court of Appeal, 697 So.2d 70, 71 (Fla.1997) ("[W]e routinely entertain appeals from final orders in death penalty collateral proceedings and on occasion review interlocutory orders in such proceedings.... [I]n addition to our appellate jurisdiction over sentences of death, we have exclusive jurisdiction to review all types of collateral proceedings in death penalty cases." (emphasis added; citations omitted)); cf. Trepal v. State, 754 So.2d 702, 707 (Fla.2000) (discussing the *516 requirements for a defendant in a capital case to obtain relief through an interlocutory appeal of a postconviction discovery "order" (emphasis added)). If the trial court never rules on the motion to depose, Rhodes would likely be forced to file a petition for writ of mandamus should he wish to seek further review of the claim in this Court. See art. V, § 3(b)(8), Fla. Const. (authorizing this Court to issue writs of mandamus). I conclude that Rhodes should not be relegated to seeking the extraordinary and discretionary remedy of mandamus to compel the trial court to perform such a basic duty when a mere directive from this Court in the instant appeal to rule on the pending motion would suffice.
Accordingly, I dissent in part.
NOTES
[1] The facts are taken from Rhodes's direct appeal and his appeal from resentencing. See Rhodes, 547 So.2d 1201; Rhodes, 638 So.2d 920.
[2] Rhodes raised the following eight claims in his appeal from resentencing: (1) the trial court erred by sua sponte excusing two prospective jurors; (2) the court erred in permitting the State to present hearsay evidence during the resentencing proceeding; (3) the court erred in permitting the State to interject irrelevant matter into the proceedings, including evidence of statements Rhodes made following his 1973 Oregon arrest, which were allegedly taken in violation of his constitutional rights; (4) the jury was misled regarding its role in the sentencing process and instructed to consider a nonstatutory aggravating factor; (5) the court erred in instructing the jury on and finding in aggravation that the murder was committed while Rhodes was engaged in committing an attempted sexual battery; (6) the court erred in failing to afford Rhodes an opportunity to be heard before he was sentenced; (7) death is not proportionately warranted in this case; and (8) one of the two written judgments for first degree-murder must be stricken.
[3] Rhodes claimed the following: (1) that public records were withheld; (2) that trial counsel failed to adequately investigate and prepare additional mitigating evidence and failed to adequately challenge the State's case; (3) that resentencing counsel was ineffective for failing to object to the improper sexual battery aggravator jury instruction; (4) Rhodes was denied his right to effective representation by the lack of funding available to postconviction counsel; (5) the one year filing requirement under Florida Rule of Criminal Procedure 3.851 violates due process; (6) that trial counsel's ineffective assistance rendered Rhodes's death sentence unreliable; (7) that access to Rhodes's trial attorney file was improperly withheld; (8) that access to record and files in the trial judge's possession were improperly withheld under Florida Rule of Judicial Administration 2.051; (9) that lack of a reliable capital trial transcript prohibited meaningful appellate review; (10) that counsel was ineffective for failing to object to the introduction of gruesome and unfairly prejudicial crime scene photos and video, and the use of a skeleton as demonstrative evidence; (11) that Rhodes's rights under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), were denied through the ineffective assistance of counsel and inadequate assistance of mental health experts; (12) that the State knowingly withheld evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (13) that Rhodes was impermissibly prohibited from interviewing jurors; (14) that the State violated Rhodes's rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and trial counsel was ineffective for failing to object on these grounds; (15) that Rhodes failed to receive the benefit of an adequate mental health evaluation (same as claim 11); (16) that police lacked probable cause to arrest Rhodes and that the evidence thereafter obtained was inadmissible; (17) that Rhodes is innocent of first-degree murder and innocent of the death penalty; (18) that Rhodes was denied his constitutional rights by the State's use of Rhodes's fellow inmates as witnesses during the guilt phase of the trial; (19) that the trial court erroneously instructed the jury on the standard by which they must judge expert testimony presented during the penalty phase; (20) that the State knowingly presented misleading testimony from witness Harvey Duranseau; (21) that newly discovered evidence supports an assertion that FBI Agent Michael Malone's expert trial testimony concerning hair evidence was inadmissible and unreliable; (22) that Rhodes was denied a fair trial as a result of the trial court's failure to sequester the jury due to alleged pretrial publicity; (23) that cumulative errors by the trial court during the guilt phase of trial rendered Rhodes's conviction fundamentally unfair; (24) that the cumulative effect of multiple instances of improper closing argument by the State deprived Rhodes of a fair trial; (25) that the introduction of nonstatutory aggravating factors before the jury during resentencing resulted in the arbitrary and capricious imposition of the death penalty; (26) that Rhodes was denied a fundamentally fair resentencing trial as a result of the State's suggestion to the jury during voir dire that the law required it to recommend death; (27) that Florida's capital sentencing statute is unconstitutional; (28) that Rhodes is innocent of the death penalty; (29) that the sentencing jury was misled and incorrectly instructed that a majority of the jury was required for a recommendation of death and counsel was ineffective for failing to object to the instruction; (30) that the sentencing jury was misled by comments and instructions that inaccurately diluted the jury's sense of responsibility towards sentencing; (31) that penalty phase jury instructions improperly shifted the burden to the defendant to prove death was inappropriate and the sentencing judge employed an improper standard in sentencing; (32) that the trial court erred in failing to find and weigh all mitigating circumstances; (33) that Rhodes was denied effective assistance of trial counsel during voir dire of his resentencing jury; (34) that Rhodes was denied a proper direct appeal due to omissions in the resentencing record; (35) that Rhodes was denied a fair resentencing trial due to the cumulative procedural and substantive errors; and (36) that Rhodes's sentence of death by electrocution is cruel and unusual punishment in contravention of the Eighth and Fourteenth Amendments of the United States and Florida Constitutions.
[4] The record demonstrates that Agent Malone maintained both at trial and the postconviction hearing that he examined all of the hairs submitted to him. There is insufficient record evidence to refute that claim.
[5] Rhodes also vaguely argues that counsel was ineffective for failing to "file motions challenging the statutory aggravators," and for failing to challenge the constitutionality of Florida's death penalty. However, Rhodes neither alleges upon what ground counsel should have challenged the State's evidence in aggravation nor upon what basis Florida's death penalty is unconstitutional. We cannot find counsel ineffective absent specific allegations of overt acts or omissions. See Gore v. State, 964 So.2d 1257, 1277 (Fla.2007) (citing Freeman v. State, 761 So.2d 1055, 1069 (Fla. 2000)) ("The defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based.").
[6] Counsel decided not to call other witnesses for various practical reasons. For instance, Rhodes's two half-brothers were not contacted because they were serving in Operation Desert Shield and stationed in Saudi Arabia. Also, resentencing counsel was unable to contact Rhodes's grandmother, Mary Vailes; however, Dr. Taylor, Rhodes's psychiatrist, contacted her and her statements were presented to the jury through his testimony.
[7] Rhodes argues that trial counsel was ineffective during the guilt phase because he (1) failed to properly preserve his objection during jury selection; (2) failed to impeach a State witness; (3) failed to object to improper testimony by detectives; and (4) failed to object to testimony from Dr. William Ross Maples, a forensic anthropologist. Rhodes contends that resentencing counsel was ineffective for failing to (1) adequately challenge the trial testimony of the jailhouse informants; and (2) object to jury instruction error.
[8] Rhodes also lists several claims, denied below, that he recognizes have been rejected in other death penalty cases, and concedes are being presented for preservation purposes only. See Sireci v. State, 773 So.2d 34, 41 n. 14 (2000) (directing petitioners wishing to raise claims solely for the purpose of preserving them to designate the issues as such, noting that "[w]e will consider the issues preserved for review in the event of a change in the law if counsel so indicates by grouping these claims under an appropriately entitled heading and providing a description of the substance"). Rhodes submits the following claims for preservation: (1) Claim XXX, failure to object to various comments and arguments by the State on the ground that they diminished the jurors' sense of responsibility, in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); (2) Claims XVII and XXVIII, Rhodes is innocent of first-degree murder and the death penalty; (3) Claim XXXI, penalty phase instructions improperly shifted the burden to the defense to prove that death was the inappropriate sentence and trial counsel failed to object; (4) Claim XXVII, jurors received inadequate guidance on the aggravating factors and Florida's statute is unconstitutionally vague; (5) Claim XIII, denial of constitutional rights and right to collateral counsel due to rules prohibiting juror interviews; (6) Claim X, the State improperly introduced gruesome and prejudicial photographs, videos and a skeleton at trial; (7) Claim XI, Rhodes was denied effective and adequate mental health assistance; (8) Claim XIV, the State violated Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Rhodes's statements were improperly admitted; (9) Claim XVI, the police lacked probable cause to arrest Rhodes; (10) Claim XIX, the trial court erroneously instructed on judging expert testimony; (11) Claims XX and XXIV, the State's use of misleading and improper argument; (12) Claim XXII, the trial court failed to sequester the jury; (13) Claim XXIX, the jury was misled and incorrectly informed of its function; (14) Claim XXV, the State improperly introduced nonstatutory aggravating circumstances; (15) Claim XXXII, the trial court failed to find mitigation in the record; (16) and Claim XXXVI, electrocution is unconstitutional.